W. Kenneth GOODSON, as Presiding Bishop of the Alabama-West Florida Conference of the Methodist Church, Powers McLeod, as District Superintendent of the Mobile District of the Alabama-West Florida Conference of the Methodist Church, Board of Trustees of the Alabama-West Florida Conference of the Methodist Church, a corporation, Plaintiffs,

v.

NORTHSIDE BIBLE CHURCH, a corporation, E. C. Persons, Stanley B. Daugherty and Alvin W. Blount, as trustees of Northside Bible Church, Defendants.

Civ. A. No. 3926–65.

United States District Court
S. D. Alabama, S. D.

Nov. 18, 1966.

**100**

Harry H. Riddick, Hamilton, Denniston, Butler & Riddick, Mobile, Ala., Albert W. Copeland, Hobbs, Copeland, Franco, Riggs & Screws, Montgomery, Ala., for plaintiffs.

Pierre Pelham, Mobile, Ala., for defendants.

## OPINION AND JUDGMENT

DANIEL HOLCOMBE THOMAS, Chief Judge.

By *per curiam* opinion and order entered in this cause on the *18th* day of November 1966, the three-judge-court convened herein determined that the case was not appropriate for a three-judge-court, but was one to be determined by a single district judge, since no injunctive relief was sought against any officer of the State of Alabama, as required for proceeding under Section 2281 et seq., of Title 28, United States Code. Accordingly, the three-judge-court, originally convened on the prayer of the plaintiffs, was dissolved.

And it appearing to the court that the United States District Court for the Southern District of Alabama has jurisdiction of the persons and issues involved, and the cause having been submitted to the court on the pleadings and Stipulation of Facts filed by the parties, the court now finds and concludes as follows:

This is in essence a suit for declaratory judgment and injunctive relief against the defendants who presently are in possession of certain church property to which they claim ownership under the provisions of a statute of the State of Alabama ("Protection of Certain Religious, Charitable and Educational Trusts," Title 58, Secs. 104–113, Code of Alabama.) Plaintiffs allege that said statute is contrary to the provisions of the First and Fourteenth Amendments to the Constitution of the United States, and invoke the jurisdiction of this court under the provisions of Title 28, United States Code, Sec. 1331. The requisite jurisdictional amount has been stipulated to, but not the presence of a federal question.

The plaintiffs are representatives of The Methodist Church, and seek to have the court declare Title 58, Sec. 104–113, Code of Alabama, unconstitutional and inapplicable to the parties herein. The Alabama act in question, commonly known as the "Dumas Act", was passed by the Alabama legislature in 1959, and provides in substance that where a 65% majority of adult members of a local church finds and declares itself to be in disagreement the the " * * * laws, discipline, social creeds and jurisdictional system of the parent church with respect to its social standards, practices or policies existing at the time the local church became affiliated or merged with the parent church * * * ", the majority may sever its connection with the parent church and retain the possession and ownership of the local church property free and clear of any trust such as that set forth in the deed to the Trinity Methodist Church, the defendants' predecessor in title.

The defendants have taken the position that this court should stay its proceedings pending the outcome of First Methodist Church of Union Springs, Alabama, v. Scott, (Circuit Court of Bullock County, Alabama, In Equity No. 4638) wherein the Dumas Act has been challenged. This litigation is currently on appeal before the Supreme Court of Alabama and no decision has been announced. The defendants rely upon the *Pullman* doctrine (Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). They contend that in cases where state action is being challenged in federal court as contrary to the federal constitution, and questions of state law may be dispositive of the case, the federal court should abstain until the questions of state law have been adjudicated by the state court.

However, the complaint in the *Pullman* case, supra, sought to enjoin the enforcement of state action claiming that there was a denial of rights under the United States Constitution *and* claiming also that, under Texas law, there was no authority for such action. The case at bar is readily distinguishable from the *Pullman* case, as the complaint herein makes no claim that the Dumas Act is contrary to the law of the State of Alabama and this court is not called upon to make any interpretation of the Alabama law. For this reason, the court refuses to abstain from reaching the federal questions and denies defendants' motion for a stay of proceedings in this court.

The Methodist Church is a major protestant denomination with a connectional, as opposed to a congregational, structure. The Alabama courts have taken judicial knowledge of the denomination's plan of church government. Dunn v. Ellisor, 225 Ala. 15, 141 So. 700; Malone v. La Croix, 144 Ala. 648, 41 So. 724. This connectional structure is summarized in the complaint and admitted by the defendants.

"The Methodist Church was at the time of the aforesaid conveyance and at all times thereafter has been and is a connectional church, governed by representative bodies, with an episcopacy whose powers and duties are constitutionally defined. It has an itinerant ministry in that its ministers are assigned by officials of The Methodist Church and are not called by local societies or subject to the control or discipline of local societies. The basic representative body of The Methodist Church is the Annual Conference made up of ministerial and lay delegates from local societies in each area embraced within an Annual Conference. An Annual Conference is divided for purposes of administration into Districts. The administration of a District is entrusted to a District Superintendent. The General Conference of The Methodist Church, made up of delegates from each Annual Conference of the Church, is the highest legislative body of the Church, determining the ecclesiastical and temporal policies of the Church. The Judicial Council is the highest judicatory body of the Church, deciding appeals taken on legal issues raised within the Church. The Discipline of The Methodist Church is the book of law of the Church containing the Articles of Religion, the Constitution, the rules of the church concerning the moral conduct of its members, and the legislation of the various General Conferences defining the form of government, the duties, powers and privileges of the members, ministers and various bodies of the Church, including the law of the Church with reference to the acquisition, conveyancing and alienation of real estate. The basic representative body of each local society of the Church is the Quarterly Conference which is composed of those members, and vested with the powers and privileges as defined in the Discipline."

Sometime prior to 1953, Trinity Methodist Church was organized in Mobile County, Alabama, as a local society of The Methodist Church. In April of 1953, lands in Mobile County were conveyed to three named trustees of the local society by a deed in which the trust was declared:

" * * * that said premises shall be used, kept and maintained as a place of divine worship of The Methodist Ministry and members of The Methodist Church; subject to the Discipline, usage and ministerial appointments of said church as from time to time authorized and declared by the General Conference and by the Annual Conference within whose bounds the said premises are situated. This provision is solely for the benefit of the grantee, and the grantors reserve no rights or interest in said premises except as are expressly reserved by the provisions of this deed."

The trust clause of the Trinity deed is in conformity to the provisions set forth in the body of law of The Methodist Church relating to its real estate. This

body of law is contained in the Discipline of The Methodist Church.

The members of Trinity, finding themselves in basic disagreement with certain social policies of the parent denomination, and acting under the provisions of the Dumas Act, have separated themselves from the parent denomination and claim the right of ownership of the real estate conveyed by the Trinity deed.

No question here exists as to the compliance by the local congregation with the procedural steps set forth in the Dumas Act. After declaring itself to be in basic disagreement with policies of the parent church, more than the statutory majority of 65% of the local congregation duly separated itself from membership in The Methodist Church. The defendants are the representatives of the withdrawing members of Trinity; and the defendants and the class they represent are in possession of the church property, claiming to own the same pursuant to the authority of the Dumas Act.

The plaintiffs attack the constitutionality of the Dumas Act and assert that the Act is offensive to the First and Fourteenth Amendments of the Constitution of the United States, the First Amendment being made applicable to the states under the Fourteenth, Hamilton v. Regents of the University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343; People of State of Illinois ex rel. McCollum v. Board of Education, etc., 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649.

As early as Watson v. Jones, 80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1871), the Supreme Court applied the law of the denomination to a property dispute between factions of a local, connectional church which split over the slavery issue. Watson v. Jones became a landmark decision and has been accepted throughout all American jurisdictions as committing the judiciary to apply the law of the denomination to controversies arising within such denomination. It is clear that if the law of The Methodist Church is applied to the present dispute, the plaintiffs, as representatives of The Methodist Church, would be entitled to the local church property. Turbeville v. Morris, 203 S.C. 287, 26 S.E.2d 821.

■■ The trust clause in the Trinity deed is part of the doctrinal heritage and history of The Methodist Church. This means of local church ownership is older than Methodism as a separate denomination. "Such a form of trust deed and ownership of church property, safeguarding the rights of the conference which has jurisdiction over the individual congregations, is important and necessary under the Methodist polity, with its distinctive feature of an itinerant ministry." Turbeville v. Morris, supra. The Methodist polity of an itinerant ministry, like the Methodist trust clause, antedates the organization of the Methodist Church as a separate denomination. Under this system, ministers are assigned to churches by the officials of the parent body rather than by act of the local congregation. The ministers are thus subject to the control of the parent rather than the local body. By vesting in a 65% majority of the local congregation the power to abrogate the Methodist trust clause, the Dumas Act effectively impairs or destroys the itinerant ministry feature of the Methodist Church. Under the First Amendment, the states are not permitted to so intrude on the internal affairs of a religious order. The court is not required, or constitutionally authorized, to pass on the wisdom of the Methodist structure and polity. The court is bound by the Constitution to protect it.

"Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120. The *Kedroff* case arose from an act of the New York legislature creating an administratively autonomous district of the Russian Orthodox Church, and transferring to it control over American churches which had formerly been subject to the supervision of the Patriarch of Moscow.

The New York statute resulted from the political domination of American congregations by the Soviet church authorities. The Supreme Court held the New York statute unconstitutional as being violative of the First Amendment. Subsequently, in Kreshik v. St. Nicholas Cathedral, 363 U.S. 190, 80 S.Ct. 1037, 4 L. Ed.2d 1140, the Supreme Court held that New York could not effect the transfer of the church property through the judicial application of cy pres or equitable approximation.

The Methodist Church has a constitutionally protected freedom to provide for the method of the selection and assignment of its clergy so long as no improper methods of choice are used. One of the methods selected by it is the trust clause. To allow the trust clause to be overridden by a legislatively defined majority is to defeat that constitutional right.

The court finds no significance in the size of the majority of the local congregation which wishes to separate from the parent denomination. For, as stated by Justice Frankfurter, in his concurring opinion in Kedroff v. St. Nicholas Cathedral, supra, " * * * it is not a function of civil government under our constitutional system to assure rule to any religious body by a counting of heads." 344 U.S. at 122, 73 S.Ct. at 158.

Quite apart from the legislative invasion of the Dumas Act into the constitutionally safeguarded freedom of selection of clergy declared in *Kedroff*, the court concludes that the Dumas Act violates what Jefferson termed the "wall of separation between Church and State" on other grounds. No constitutional principle is more firmly imbedded in our heritage than this separation. It is a fundamental to our liberty. James Madison explained its value in his "Memorial and Remonstrance Against Religious Assessments" (II Madison, 183–191) when he argued: "Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with same ease any particular sect of Christians, in exclusion of all other Sects?"

Protestant Christianity in this country has produced a variety of church structures and governments, creeds and doctrines. Under the protections of the First Amendment, these many expressions of individual religious concepts have evolved an equally varied system of property ownership and control. From the corporation sole to the purely congregational type of church organization, Americans have been free to exercise their religion without infringement by state authorities. This plurality of religious expression was recognized in Watson v. Jones, supra, where the Supreme Court declared:

"The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations and officers within the general association, is unquestioned."

The Dumas Act operates only on protestant denominations of Christian faith. Pretermitting whether this classification is in and of itself violative of constitutionally equal protection, the court is persuaded that the effect of the Dumas Act is to engraft upon a significant segment of American protestantism a legislative scheme of property ownership in derogation of the ecclesiastical systems evolved by several protestant denominations. For example, in Presbyterian, Episcopalian, and Lutheran churches there are connectional property features similar to those within the Methodist Church. The Dumas Act does not operate on purely congregational churches such as the Southern Baptists. It does, however, create a legislative body of a 65% majority of adult members for local churches within a connectional structure. It grants to this legislative body the right, power and authority to change established systems of church

ownership without regard to the ecclesiastical law of the denomination. The warning of Madison becomes fact if the legislature is permitted to write into the ecclesiastical law of connectional denominations a control of local church property by a 65% majority. For what is accomplished by the Dumas Act is a "particular sect of Christians", at least as applied to protestants, in which local property control is vested in a majority of not more than 65% of the local congregation. The establishment of such a class or sect is constitutionally prohibited.

The Supreme Court has interpreted the First Amendment as prohibiting a state from requiring an affirmation of a belief in God by an applicant for a commission as a notary public, Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982; from requiring the reading of the Bible or the recitation of the Lord's Prayer in public schools, School District of Abbington v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844; from requiring the recitation of a nondenominational prayer in public schools, Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601; from permitting compulsory religious teaching in public schools even where students were given a choice of instructions, People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649; and from denying unemployment compensation to a Seventh Day Adventist who refused to work on Saturday, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965. The concern of Jefferson and Madison has found expression in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, when the majority opinion declared: "Neither a state nor the Federal government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another." 330 U.S. at 15, 67 S.Ct. at 511. The principle was restated in School District of Abbington v. Schempp, supra, where Justice Clark for the majority quotes with approval from the unpub-

lished opinion of an Ohio case: "The government is neutral, and, while protecting all, it prefers none, and it disparages none." 374 U.S. at 215, 83 S.Ct. at 1567.

By the passage of the Dumas Act, Alabama has expressed a preference to and aided those who profess a belief in a congregational structured church. This it cannot do.

In Everson v. Board of Education, supra, the majority opinion declares:

"The First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach." 330 U.S. at 18, 67 S.Ct. at 513.

This court holds that by the Dumas Act, Alabama has breached it here.

■ Finally, the court notes that the deed before it was delivered prior to the passage of the Dumas Act. The trust clause requires that the trustees hold the property " * * * as a place of divine worship of The Methodist ministry and members of the Methodist Church" * '* *. Without defining the real property interests in the Trinity property of the more than 300,000 Methodists within Alabama, it is apparent that such interests would be terminated by the Dumas Act procedure of the local congregation. Under the Dumas Act, the property rights created by deed in 1953 are retroactively divested from all persons other than the 65% majority of the local congregation. The destruction of the property interests of other Methodists in the Trinity property is, under the Dumas Act, effectuated without notice and without any right to be heard. To give effect to such a retroactive divestiture would be contrary to the Due Process provisions of the Fourteenth Amendment.

In accordance with the foregoing opinion, it is

Ordered, adjudged and decreed that:

1. Defendants motion to stay be and the same hereby is overruled.

2. The Dumas Act (Title 58, Sec. 104 through 113, Code of Alabama) is inapplicable to the parties hereto as to the real estate described in the plaintiffs' complaint because the application of said Dumas Act would be violative of the Fourteenth Amendment to the Constitution of the United States.

3. The defendants are hereby enjoined from interfering with or denying to plaintiffs the right to possession of the real estate described in the complaint, the description of which is stipulated to between the parties and is as follows:

Commencing at the Northwest corner of Section Thirty-three, Township Three South, Range One West, thence run South One Degree Thirty-four minutes East Three and Six-tenths feet to a point on a fence; thence continue South One Degree Thirty-four minutes East Eighty-four and Six-tenths feet to the North line of Turner Road; thence along the North line of said road run South Seventy-one degrees Fifty minutes East Six Hundred Twenty-three and Five-tenths feet for the point of beginning; said point is marked by an iron pipe; thence run North Eight Degrees Twenty-nine minutes East Two Hundred Ninety-three and Three-tenths feet to a point marked by an iron pipe; thence run South Eighty-nine Degrees no minutes West One Hundred Thirty-eight and Thirty-five Hundredths feet to a point; thence run Southwardly Two Hundred Forty-three and Seventy-one Hundredths feet, more or less, to a point on the North line of Turner Road, which point is One Hundred Eighty feet West of the beginning corner; thence run South Seventy-one degrees Fifty minutes East along the North line of Turner Road, One Hundred Eighty feet to the point of beginning, being Lots Eight, Nine and Ten of COHEN'S SUBDIVISION, in Prichard, Alabama, as per plat of William R. Irby, dated April 14th, 1953, and filed for record on April 17th, 1953, in the Probate Records of Mobile County, Alabama.

And defendants are ordered to deliver said real estate of Trinity Methodist Church, owned by said Church and The Methodist Church on June 1, 1965, to plaintiffs within thirty days of this order.

4. Costs incurred are taxed against defendants, for which let execution issue.