## FRANKLIN v. MORTGAGE GUARANTY & SECURITY CO.

### No. 6612.

Circuit Court of Appeals, Ninth Circuit.
March 21, 1932.

Kaye & Johnstone, of Los Angeles, Cal., for appellant.

Gray, Cary, Ames & Driscoll, of San Diego, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

This is an appeal from a decree of the United States District Court for the Southern District of California, Southern Division, wherein judgment was entered in favor of the appellee for $8,200, with interest and costs.

The appellant was president and director of the appellee company on the dates at which the transactions complained of took place. The lower court found that on June 20, 1922, at Yuma, Ariz., the appellant entered into a written agreement with Henry Schumann-Heink, a duly authorized broker

of San Diego, Cal., wherein Schumann-Heink was employed to sell to the public all of the shares of preferred stock and 2,500 shares of the common stock of the appellee, and was to receive therefor a commission of 20 per cent. of all moneys realized from the sale of such stocks; that the appellant, for the purpose of making a secret profit from the sale of such stock, and without the knowledge, acquiescence, and consent of the appellee or its officers or directors, demanded of Schumann-Heink, the company's fiscal agent, a division of the commissions to be earned by the latter, and that the latter agreed to share with the appellant certain commissions earned or to be earned by Schumann-Heink; that on or about September 12, 1923, certain shares of the appellee's stock were sold by the appellant and Schumann-Heink to J. W. Edwards; that on that day the appellant caused to be withdrawn from the funds of the appellee corporation $1,200, representing a commission of 20 per cent. on said sale, the appellant retaining such sum without the knowledge or consent of the appellee, and pursuant to the above-mentioned agreement between himself and Schumann-Heink.

The lower court also found that on April 9, 1924, certain shares of the appellee's stock were sold by the appellant and Schumann-Heink to Elsie Sullivan, and that thereafter the appellant caused to be withdrawn from the funds of the corporation $13,500, representing a commission of 20 per cent. of the consideration paid for said stock; that, without the knowledge or consent of the appellee, $7,000 was taken by the appellant for his own use and benefit, in pursuance of the aforesaid agreement with Schumann-Heink; that neither the appellee corporation nor its directors or officers were informed of the transaction whereby the appellant obtained these secret commissions until within a few months immediately preceding the institution of the action in the court below, when the receipt of the secret profits was revealed by an audit of the company's books; and "that it is not true ' ' * that upon the consummation of said transaction the proper entry was immediately made upon the books of said corporation open to the inspection of the directors and auditors."

The court's findings of fact also include the statements that, of the $1,200 withdrawn from the appellee's treasury, the appellant paid J. W. Edwards $600 as a rebate upon the purchase price of the property purchased from him; that it is not true that any of the transactions are barred by the laches of the plaintiff or by section 2060, Revised Code of

Arizona, or by section 338, subdivision 4, of the Code of Civil Procedure of California; and "that it is not true that at the time of the alleged sales by the complainant of its capital stock to the respective persons named in the complainant's bill of complaint herein, the complainant corporation held a permit from the Commissioner of Corporations of the State of California, and a similar permit from the Commissioner of Corporations of the State of Arizona, authorizing said corporation to sell said shares for cash only, and that the said sales of said stock * * * were in violation of the terms of said permits. * * * "

We believe that each of these findings of fact by the lower court was supported by evidence, in all material respects.

Though there are seventeen assignments of error, the appellant's brief discusses only ten points. Since several of the assignments attack the court's findings of fact, with which, as we have said, we concur, we will follow the groupings of argument observed in the appellant's brief.

1. A careful study of the bill of complaint leaves us unable to support the appellant's contention that the bill "failed to make out even a prima facie case." Our reasons for holding the complaint sufficient will appear more fully in our discussion of subsequent headings of the appellant's argument.

2. The appellant contends that the appellee was "under an implied obligation for extraordinary services." A study of the record fails to disclose that Franklin's services to the appellee company were "extraordinary." Furthermore, the appellant quotes us no authority for the proposition that such "extraordinary" services, had they been performed, would have justified Franklin's taking "secret profits" from the corporation. The authorities that the appellant does quote deal with "implied contracts," "legal claims," "quantum meruit," and "implied assumpsit" —and not secret agreements between corporate agents.

3. We agree with the appellant that generally the burden of proof to show fraud is upon him who alleges it. We believe that this burden has here been amply sustained, particularly in view of the fact that, once a fiduciary relation is established, the burden rests upon the trusted agent to show full disclosure of all transactions attacked. This disclosure is not established by the record.

In Victor Oil Co. v. Drum et al., 184 Cal. 226, 235, 236, 193 P. 243, 247, the court said:

**836**

"* * * When once it is apparent that Drum occupied a fiduciary relation toward the corporation and his associates in it, the burden rested on him to show the full disclosure, without which the transaction was an improper one."

Turning now to the record, we find the following testimony by the appellant himself: "There were only these two instances, and that is all that could have occurred, this one instance with Elsie Sullivan and the other instance was the Edwards deal; those are the only two in which I took commissions."

And the appellant's witness, Schumann-Heink: "I told Mr. Franklin that I am willing to pay him some money, feeling that he was doing a great deal of work in what I deemed looked out for the interests of the stockholders, which to me represented a considerable responsibility."

We have been directed to no part of the corporation's records disclosing Schumann-Heink's understanding with Franklin. On the contrary, we find the following significant testimony:

"Q. Mr. Franklin, I hand you a minute book of the Mortgage Guaranty and Security Company, or what purports to be the minute book of the * * * Company, and will ask you to go through that book and point out any minutes of meetings reciting a report by you or by Mr. Schumann-Heink or by any one else to the directors of your receiving commission of $7,000 on this Sullivan deal, or commission of $1,200 on this Edwards transaction.

"Mr. Kaye. Objected to on the ground it assumes a fact not in evidence.

"The Court. Well, point out, if you can find it, any such recitation on the minutes respecting any commission in any amount, under either head.

"The Witness. Why, I don't know that there is anything in the minutes here that authorized any commissions."

4. The complaint is made by the appellant that the appellee failed to produce "evidence presumably in its possession." The record shows that notice to produce was mailed to the appellee's attorneys at San Diego, Cal., from Los Angeles, Cal., on October 17, 1930, four days before the opening of the trial. Some of the records asked for were produced, and the appellant could have introduced secondary evidence as to those that were not produced.

5 and 6. The appellant contends that the evidence shows ratification and acquiescence by the appellee, both express and implied. We cannot concur with this view. While there are certainly bookkeeping and check-stub entries referring to these transactions, they are not sufficiently full and explicit to amount to a disclosure of profits taken by a fiduciary agent of the company. Furthermore, the corporation's records are absolutely barren of any reference to the Franklin-Schumann-Heink agreement as to commissions.

In this case, therefore, there is not the "full disclosure" required by the Victor Oil Company Case, supra.

7. It is contended that the trial court erred in excluding certain testimony alleged to have been offered by the appellant. Franklin was asked to testify concerning conversations between himself and certain other directors and officers of the appellee corporation as to the Edwards transaction. The record fails to disclose the proper offer of proof, as required by rule 11 of this court. Furthermore, a casual conversation—which, for all this court knows, might have been relied upon—would not be sufficient to fix official knowledge upon the complaining corporation.

8. As an additional defense to this action, the appellant urges "the illegality of the transaction upon which its (the appellee's) claim is founded." It is further stated that the permits issued to the appellee by the proper authorities of California and Arizona, where the stock sales were negotiated, authorized such sales for cash only, and that at the time the sales were consummated the Arizona permit had expired.

There is evidence tending to support the appellant's contentions as to the illegality of these stock sales, and, for the purpose of this argument, we are assuming such illegality.

It is well-settled general law that the law will not grant relief when a cause of action is grounded upon an illegal transaction. In such a case, regardless of the bad faith of the other party, the courts have repeatedly followed the maxim of "Better is the condition of the defendant." Higgins v. McCrea, 116 U. S. 671, 686, 6 S. St. 557, 29 L. Ed. 764.

But recovery is not barred if the plaintiff does not require the aid of the illegal transaction to establish his case. If the illegality taints merely a collateral contract, upon which the plaintiff need *not* rely, he is not denied redress.

The rule was lucidly stated by Mr. Jus-

tice Strong in the leading case of Planter's Bank v. Union Bank, 16 Wall. (83 U. S.) 483, 499, 500, 21 L. Ed. 473: "But when the illegal transaction has been consummated; when no court has been called upon to give aid to it; when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value; and when they have been carried to the credit of the plaintiffs, the case is different. The court is there not asked to enforce an illegal contract. The plaintiffs do not require the aid of any illegal transaction to establish their case. It is enough that the defendants have in hand a thing of value that belongs to them. Some of the authorities show that, though an illegal contract will not be executed, yet, when it has been executed by the parties themselves, and the illegal object of it has been accomplished, the money or thing which was the price of it may be a legal consideration between the parties for a promise, express or implied, and the court will not unravel the transaction to discover its origin."

In McBlair v. Gibbes et al., 17 How. (58 U. S.) 232, 238, 244, 251, 15 L. Ed. 132, the court said:

"These cases show that the assignment of Lyde Goodwin to Robert Oliver, in 1829, being collateral to, and disconnected from the illegal transaction out of which the Mina contract arose, was valid and binding upon Goodwin, and vested in Oliver all the benefits and advantages, whatever they might be, derived from that contract.

"The assignment from Goodwin to Oliver, though the assignment of an illegal contract—which contract, therefore, imposed no legal obligation, and rested simply upon the honor of the parties—was not within the condemnation of the Maryland insolvent laws, as expounded by her courts, as the right was not derived under but entirely independent of them. Those laws have no application to this assignment."

Mr. Chief Justice Marshall, in Armstrong v. Toler, 11 Wheat. (24 U. S.) 258, 274, 6 L. Ed. 468, said:

"The general proposition stated by Lord Mansfield, in Faikney v. Reynous, that if one person pay the debt of another, at his request, an action may be sustained to recover the money, although the original contract was unlawful, goes far in deciding the question now before the court. That the person who paid the money knew it was paid in discharge of a debt not recoverable at law, has never been held to alter the case. A subsequent express promise is, undoubtedly, equivalent to a previous request."

In the instant case, there is an implied promise on the part of the fiduciary officer to turn over all moneys received on behalf of the corporation, *regardless of their source,* and not to withdraw commissions for himself under a secret agreement with another fiduciary officer. See, also, Armstrong v. American Exchange Bank, 133 U. S. 433, 469, 10 S. Ct. 450, 33 L. Ed. 747; Gilbert v. American Surety Co. of New York et al. (C. C. A. 7) 121 F. 499, 503, 61 L. R. A. 253.

The precise question was presented to the Supreme Court of Alabama in Robertson v. Business Boosters' Country Club, 212 Ala. 621, 103 So. 576, 577. We believe that the reasoning is sound, both in law and in morals: "Can an officer of a corporation, receiving the funds paid to his company for stock, set up this illegality of the sale in defense of an action for an accounting, or in trover for the conversion of such funds? We answer, No. The statement of the proposition is enough to show no other answer can comport with law or morals. His relation to the fund, as well as the transactions from which it was derived, is wholly different from that of the subscribers. Receiving the fund as that of the corporation is an admission of its title. In an action for an accounting, no other proof is necessary. The contract with the subscribers was fully executed, so far as relates to the question in hand. The action is not for enforcement of nor dependent upon proof of the contract. The duty of the officer holding the fund in trust *was the same as between him and his company, however the fund was derived.* The subject-matter of the suit is a fund in hand, not how it was acquired. [Many cases cited.]" (Italics our own.)

So in the instant case. The complaint alleges that the appellant, Franklin, "caused to be withdrawn funds of the complainant." So far as the appellant's responsibility to the company is concerned, it is completely established when it is proved that certain funds in the lawful possession of the corporation were wrongfully withdrawn by the appellant. In the language of the Supreme Court, we are not called upon further to "unravel the transaction to discover its origin."

In Gipson v. Knard, 96 Ala. 419, 11 So. 482, 483, the Supreme Court of Alabama said: "According to the averments of the complaint, the money sued for never belonged to the defendant. It was paid over to him for and on account of the plaintiff, and

it was in this capacity that the defendant received it. A third person, who has received money for the use of another, cannot withhold and appropriate it to his own use on the ground that it arose out of an illegal transaction between the payer and claimant."

In 2 Corpus Juris, § 411, pp. 746-748, the rule is thus expounded: "The fact that the contract or transaction between the principal and the third person, in pursuance of which the funds or property was delivered to the agent, was illegal and unenforceable does not affect the liability of the agent to account therefor to the principal; this has been held true, although the agent negotiates the illegal transaction or is otherwise a participant therein. * * * The ground taken in support of a recovery is that, although the law would not have assisted the principal by enforcing the recovery of the money from the party by whom it was paid, because the law will not aid in the completion of an illegal contract, yet when that contract is at an end, the agent, whose liability arises solely from having received the money for another's use, can have no right to claim it. Another reason for this doctrine appears sound. It is that it is contrary to public policy and good morals to permit employees, agents, or public servants to seize or retain the property of their principals, although it may be employed in an illegal business and under their control. No consideration of public policy can justify a lowering of the standard of moral honesty required of persons acting in such capacities. Theoretically, there is a distinction between enforcing an illegal contract and enforcing a duty not springing from the contract, but arising solely from the receipt of the money or goods."

It is true that in the instant case the complaint sets forth, with some degree of particularity, the two sales of stock alleged to have been illegal. But the bill also contains, as we have seen, the indispensable averment that the defendant-appellant caused to be withdrawn certain funds of the corporation. The details as to the manner in which those funds came into the corporation's treasury are irrelevant and immaterial, and may be rejected as surplusage.

Finally, we do not believe that superfluous pleading should cause this court to lend itself to the unconscionable proposition that a fiduciary officer of a corporation, whose own duty it was to see that the corporate permits were kept up and their terms observed, should be allowed to retain secret profits on the theory that the corporation whose funds

he had improperly withdrawn had failed to obey the law. As the highest executive officer and as a director of the company, it was Franklin's duty to see to it that the corporation did have proper permits and that such permits were not violated. Thus Franklin was guilty of a double wrong: First, the corporate delinquency as to the permits might well be imputed to him; and, second, he entered into a secret agreement with a fellow agent to the detriment of their common principal, and under that agreement withdrew corporate funds to his own use.

We do not believe that the substantial rights of the parties in this case were affected by the fact that the plaintiff-appellee unnecessarily included in his bill a history of the sales of stock whence the withdrawn funds were derived.

9. It is contended that the bill of complaint does not state facts sufficient to constitute a cause of action, in that there is no allegation in the complaint to show why the president, directors, and officers of the plaintiff had not discovered the details of the transaction mentioned in the complaint when they were entered upon the books of the corporation. In so far as the allegation of the bill as to discovery of the fraud within less than three years is concerned, the question is solely one of the running of the statute of limitations which could not properly be raised by the objection to the introduction of evidence made on the ground that the complaint did not state the cause of action. Sacramento Suburban Fruit Lands Co. v. Melin (C. C. A. 9), 36 F.(2d) 907.

10. Finally, it is contended by the appellant that the evidence shows that the action is barred by the statute of limitations and by laches, in that "the officers, directors, and the complainant were fully informed as to the details of the Edwards transaction on or before the 14th day of January, 1924 [the date of the annual stockholders' and directors' meetings], and the within action being filed April 22, 1927, that is to say, three years, two months and eight days thereafter." It is further stated by the appellant that the company was fully informed of the Sullivan transaction on or before April 9, 1924, or three years and thirteen days before the filing of the bill of complaint.

The evidence supports the conclusion of the trial court that the fraud was discovered within three years before the action was brought, and hence that the action was not barred by the statutes of limitations as pleaded, that is, by section 338, subdivision 4, of

the Code of Civil Procedure of California or by a similar statute of Arizona.

We find no reversible error in the record, and we hold that the decree of the lower court should be affirmed.

Decree affirmed.